## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Boxed, Inc., *et al.*,[1] | Case No. 23-10397 (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF MARK ZIMOWSKI,
## CHIEF FINANCIAL OFFICER OF BOXED, INC., IN SUPPORT
## OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Mark Zimowski hereby declare under penalty of perjury:

1.     I am the Chief Financial Officer of Boxed, Inc. ("Boxed"), a Delaware corporation. Boxed and certain of its subsidiaries are debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases" or the "Cases"). I have served as the Chief Financial Officer of Boxed since April of 2021. Prior to joining Boxed, I served in a capital markets and M&A advisory capacity at UBS Investment Bank, and as a private equity investment associate at Court Square Capital Partners, where I evaluated, performed diligence, and executed control investments in businesses within the technology space. I joined Boxed in October 2016 as one of its initial financial hires. Since that time, I have worked in a number of positions with Boxed's Finance & Strategy team, including as a senior analyst, senior manager, senior director, and vice president. Further, during my time with Boxed, both in the private and public company context, I have played a pivotal role in our corporate development,

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Boxed, Inc. (6188), Boxed, LLC (8041); Jubilant LLC (2107); Ashbrook Commerce Solutions LLC (4046) and BOXED MAX LLC (5987). The service address of Boxed, Inc., Boxed, LLC, Jubilant LLC, Ashbrook Commerce Solutions LLC and BOXED MAX LLC is 61 Broadway, Floor 30, New York, NY 10006.

investor relations, and fundraising efforts. In addition, I helped lead the development of Spresso, Boxed's Software & Services business.

2.     Based on my experience with the Debtors, my review of relevant documents, and my discussions with the Debtors' advisors and management team, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records. I submit this declaration (the "Declaration") in support of the Debtors' voluntary petitions (the "Petitions") and the pleadings filed concurrently therewith (the "First Day Pleadings") to assist the Court and other parties in interest in understanding the Debtors' corporate history, business operations, and prepetition capital structure, as well as the circumstances that compelled the commencement of these Chapter 11 Cases as of the date hereof (the "Petition Date").

3.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with members of the Debtors' management team and advisors, and my review of relevant documents and information concerning the Debtors' financial affairs and sale initiatives. I am authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would competently testify to the statements set forth in this Declaration, as the information in this Declaration is accurate to the best of my knowledge and belief.

## PRELIMINARY STATEMENT

4.     The Debtors have been growth-oriented companies that operated an e-commerce retail service that provided bulk pantry consumables to businesses and household customers through orders placed over the Boxed website and the Boxed app. This service is powered by the Debtors' own purpose-built technologies. Through their Software & Services (recently rebranded

as "Spresso") business, the Debtors also provide their customers with e-commerce enabling software, data, and other technology.

5.      The Debtors have operated in the competitive online consumables market, which contains competitors that have substantially greater capital resources, lower costs, larger product portfolios, larger user bases, larger sales forces, and a greater geographic presence, and have built strong relationships with retailers and distributors.  As growth-oriented companies, the Debtors emphasized growth over short-term profits to support scaling their businesses with the goal of ultimately achieving long-term profitability.  Since inception, the Debtors have consistently been able to improve gross profits and gross margin profitability of the businesses.  However, despite successful efforts to drive meaningful gross margin improvement over time, they have never been able to reach the scale and requisite cost structure to support operating income and cash flow profitability.  Thus, the Debtors have incurred significant losses and net cash outflows from operating activities since their inception, and have relied on outside capital, in the form of equity and debt, to fund their substantial liquidity needs.  Recently, the combination of rising interest rates, persistent inflationary pressures which have depressed customers' retail spending, ongoing increases in costs of goods sold, ongoing disruption and challenges across industry supply chains, and competing solutions for online retailing, have materially and adversely affected the Debtors' liquidity, operations, prospects, and financial results.  This was unanticipated.

6.      As a result, prior to entering Chapter 11, the Debtors were in vital need of liquidity. Furthermore, they were in breach of certain covenants in their secured credit agreements that, absent forbearances, would have allowed the Debtors' lenders to declare an event of default and, *inter alia*, sweep substantially all of the Debtors' cash from the Debtors' bank accounts, thereby severely disrupting the Debtors' ability to conduct business.

7. Under the direction of the Debtors' management team and with the help of their advisors, the Debtors' developed a strategy to address their severe liquidity pressures by, *inter alia*, attempting to raise additional financing and marketing the Debtors' businesses for sale.

8. In the fall of 2022, the Debtors began negotiations with their Prepetition First Lien Secured Lenders (as defined below) concerning an amendment to the terms of the First Lien Credit Agreement (as defined below). In addition, during that time, the Debtors engaged Oppenheimer as their investment banking and debt capital advisor to support the ongoing negotiations with the Prepetition First Lien Secured Lenders, and to explore opportunities to raise incremental capital from other potential third-party lenders, including both existing unsecured lenders and new potential lenders, to help fund ongoing operating costs and working capital obligations. Ultimately, these efforts were not successful.

9. In light of ongoing liquidity challenges and limited traction on discussions to raise incremental capital through ongoing capital markets exploration, by mid-December 2022, the Debtors and their advisors began actively marketing the Debtors' assets and business lines for sale in an organized prepetition bidding process. Since that time, the Debtors and their advisors have contacted 170 potential buyers, entered into 35 confidentiality agreements, and engaged in many management presentations and fireside chats with 14 different counterparties, including with major international and U.S. retailers. Despite these four months of concerted sales efforts, the Debtors received <u>no offers</u> to purchase their e-commerce retail service and only a single indication of interest, which indication of interest was only for the Debtors' Spresso business. Ultimately, that indication of interest was neither binding nor actionable.

10. Consequently, the Debtors' commercial retail service will be wound down to support maximization of remaining liquidity. With respect to the Spresso business, the Debtors

are filing contemporaneously herewith a motion requesting approval of a private sale of the Spresso business (the "Spresso Sale") to a designee of the Debtors' Prepetition First Lien Secured Lenders to minimize further operational losses and deterioration of value of the Debtors' estates, as well as to preserve at least 25 full time employment positions within the Spresso business. The Spresso Sale remains subject to Court approval and, if there is any other interested purchaser, such party can object to the proposed sale and submit a higher binding offer.

11.     In addition to searching for potential buyers, the Debtors have worked closely with their major stakeholders, including the Prepetition First Lien Secured Lenders, to seek support of the Debtors' Chapter 11 Cases. To that end, the Prepetition First Lien Secured Lenders have agreed to the consensual use of their cash collateral, which will be done in accordance with a budget and terms approved by the Prepetition First Lien Secured Lenders. The contemplated use of cash collateral in these Chapter 11 Cases is expected to provide the Debtors with sufficient funding to implement their sale strategy in an orderly and value maximizing manner.

12.     While the Debtors have access to funds through cash collateral usage, it cannot be emphasized strongly enough that time is of the essence. Given the significant costs associated with continued operations and the administrative costs of these Chapter 11 Cases, the sale must be accomplished in an expeditious manner, if it is to happen at all.

13.     The Debtors understand that they are seeking an accelerated timeline for these Chapter 11 Cases. However, the Debtors respectfully submit that, given the severe liquidity constraints within which the Debtors are operating, time is of the essence to maximize recoveries for stakeholders, preserve jobs within the Spresso business, and keep administrative expenses manageable.

14. While the Debtors are in a precarious financial state, their tireless prepetition efforts have culminated in a well-supported and value-maximizing approach that will preserve the Spresso business as a going concern and simultaneously achieve an orderly and efficient wind down and liquidation of the Retail Segment (as defined below) and other remaining assets. If the Debtors are to succeed with these efforts, it is imperative that the Spresso Sale move quickly to maintain stability and achieve the swift and orderly transition of the Spresso business.

## BACKGROUND

15. To familiarize the Court with the Debtors, their business, the circumstances leading up to these Chapter 11 Cases, and the relief the Debtors are seeking in the First Day Pleadings, I have organized this Declaration into four parts. *Part I* provides a general overview of the Debtors' corporate history and business operations. *Part II* provides an overview of the Debtors' prepetition capital structure. *Part III* describes the circumstances leading to the filing of these Chapter 11 Cases. *Part IV* discusses the First Day Pleadings.

## I. THE DEBTORS' CORPORATE HISTORY AND BUSINESS OPERATIONS.

16. The Debtors were founded in 2013 by an experienced group of technology pioneers to operate an e-commerce retail service to provide bulk pantry consumables to businesses and household customers. This service was powered by the Debtors' own purpose-built storefront, marketplace, analytics, fulfillment, advertising, and robotics technologies. The Debtors have since begun to license and monetize the technology software that powers their e-commerce retail service, branding that offering as "Spresso".

17. The Debtors have engaged in several rounds of capital raises since inception, including equity, equity-based facilities, traditional debt, structured/convertible debt, specialty finance, and asset-based lending, among others. In December of 2021, as part of a business combination with Seven Oaks Acquisition Corp. (the "SPAC Transaction") the Debtors were able

to raise capital through the capital markets and began trading as a publicly listed entity on the New York Stock Exchange. However, leading up to the execution of the business combination agreement in June 2022, as well as during the process to obtain approval from the SEC and shareholders to consummate the SPAC Transaction, the broader SPAC market environment cooled significantly, and SPAC redemption rates began to increase. This led to a decline in the overall net proceeds from the Debtors' subsequent deSPAC transaction (the "deSPAC Transaction"), which were originally anticipated to be up to approximately $334 million, but were reduced to approximately $85 million after accounting for payments for certain transaction-related advisors fees, capital structure prepayment amounts, and prepaid public company-related expenses. In addition to higher redemptions, resulting in lower cash proceeds, the majority of the private investment in public equity "PIPE", which the Debtors closed on as part of the deSPAC Transaction, was funded through $87.5 million of convertible debt, putting additional leverage on the Debtors' capital structure following December 2021.

18.     Despite this, through the first six months of the Debtors' public listing, the Debtors were among the most successful debuts compared with those that deSPAC'ed in all of 2021, with the stock price and market capitalization accreting more than 35% from the initial listing price in December 2021. At its peak date, the Debtors' market capitalization reached levels of more than $900 million.

19.     Understanding their liquidity circumstances following the deSPAC and the importance of future capital markets initiatives, subsequent to the deSPAC, the Debtors began broad investor relations efforts to support exposure of the business to a wide range of public market investors. Since 2021, the Debtors have retained investor relations firm ICR to work closely with the Debtors' management and advise on all investor relations initiatives. The Debtors'

management team spent many hours introducing the Debtors to sell-side research analysts, including conducting on-site analyst days, attending conferences, and hosting ongoing meetings with current, and potential investors. Through this process, the Debtors were ultimately able to secure initiation of research coverage from four separate sell-side research institutions, including DA Davidson, BTIG, Citi, and Wells Fargo, who launched coverage between December 2021 to July 2022.

20. Each quarter, the Debtors typically attended up to two consumer or technology focused investor conferences or non-deal roadshows ("NDRs") with research analysts. Some examples would include ICR, BTIG, Citi, DA Davidson, UBS and Wells Fargo conferences. At each event, management would attend one on one meetings and/or group meetings with investors to provide an introduction and further education about the Debtors' story, answer questions, develop relationships, and maintain visibility within the investment community. Additionally, the Debtors' Investment Relations ("IR") website was kept up to date with publicly available presentation webcasts so that non-attendees can view the presentations live and for replay. The Debtors also made presentations available on the IR website as a resource for investors broadly.

21. In addition to NDRs and conferences throughout the year, the Debtors' management would meet with each covering analyst (currently DA Davidson, Wells Fargo, BTIG, and Citi) after every quarterly earnings call to maintain relationships with the analysts, as well as to help provide transparency to the market and investors. The Debtors would also, from time to time, meet with non-covering analysts to increase visibility more broadly among the investor community. Finally, the Debtors' encouraged investors to contact IR in every press release and on its IR website, and the inbox was closely monitored. When investors and/or analysts had follow-up questions or requested a 1x1 meeting with management, the Debtors would generally

make themselves available as often as calendars permitted, and in accordance with the Debtor's blackout policies.

22.     Given the unanticipated and lower-than-expected amount of capital raised through the SPAC Transaction, and to support ongoing investments, the Debtors put in place a Committed Capital on Demand Facility ("CCOD") in May 2022, to help support the ability to raise additional capital through the equity capital markets.  While the Debtors were able to raise approximately $6.5 million through issuance of shares through the CCOD facility, a precipitous decline in their stock price and market capitalization, impacted by macro-economic challenges and an industry-wide deterioration of investor sentiment for growth and technology companies over the course of the second half of 2022, limited their ability to access the CCOD facility to raise additional capital in a meaningful way.

23.     In addition to Boxed, the Debtors in these Chapter 11 Cases include all of the entities in the Boxed corporate family; Boxed, LLC ("Boxed, LLC"), Ashbrook Commercial Solutions LLC ("Ashbrook"), Jubilant LLC ("Jubilant"), and BOXED MAX LLC ("Boxed Max") which are all Delaware limited liability companies that were formed in 2021, except for Jubilant, which was formed in 2014.  The Debtors' principal offices are located in New York, New York, but the Debtors have maintained fulfillment centers throughout the United States.

24.     The Debtors' operations can be separated into two business segments: retail (the "Retail Segment") and the software and service business known as Spresso.

25.     Through the Retail Segment, the Debtors operated an e-commerce retail service that provided bulk pantry consumables to businesses and household customers in the United States.[2]  Unlike many of their direct competitors, the Debtors did not operate brick and mortar

---

[2]     Prior to commencing these Chapter 11 Cases, the Debtors began winding down the Retail Segment, but have continued operations to the extent was necessary and advisable to support improved liquidity and optionality.

stores. Rather, customers would place orders on the Boxed website or through the Boxed app. Through their fulfillment centers in New Jersey, Nevada, and Texas, the Debtors facilitated deliveries to customers. Further, through the 2021 acquisition of MaxDelivery, the Debtors also offered on-demand grocery delivery to certain zip codes in New York State.

26.     The Debtors offered their customers a highly curated assortment of household and office pantry items (*e.g.*, paper products, snacks, beverages, cleaning supplies, etc.). The Debtors' assortment offerings primarily consisted of first party inventory, purchased from manufacturers and distributors, and stored and shipped from the Debtor's fulfillment centers across the United States. Customers placed orders through the boxed.com website and app, and the Debtors operated fulfillment centers to pick, pack, and ship those orders and partnered with last-mile carriers to deliver directly to customers' doorsteps. The Debtors also provided customers with one-hour on-demand grocery delivery service in select zip-codes within New York City through their Boxed Market offering ("Boxed Market"). Boxed's vendors, manufacturers, and other partners could purchase and deploy advertisements on the Debtors' e-commerce platform as well as use a vendor portal called Boxed IQ to understand their return on advertising campaigns in real time. Finally, the Debtors had recently been expanding their third-party marketplace offering, whereby third-party sellers could market their respective products on the boxed.com web and app proprieties to the Debtor's customers and fulfill those orders to customers through their own "drop-ship" offering, directly.

27.     As of the date hereof, the Debtors have ceased operations of the Retail Segment in all locations other than in Union, New Jersey, which they intend to operate for a short time to maximize the value of the inventory located there.

28.     The Spresso business consists of an advanced software and services business, which monetizes the technology that historically underpinned and was developed for its e-commerce retail service.  The Spresso business leverages first-party data and machine learning to drive optimal e-commerce business results.  Spresso's product offerings include the licensing of a proprietary end-to-end e-commerce software suite that supports omni-channel retail operations, including technology offerings that drive e-commerce storefront, inventory management, order management, vendor monetization, and in-store operations, among other things, for the Debtors' licensed customers.  Spresso's offering also includes a suite of analytics and machine-learning based modular SaaS products, which help support optimization of growth, business operations, and cost management for end-customers.  Specific modular SaaS products actively being monetized today include Spresso's price optimization and customer quality tools.  The Debtors intend to sell substantially all of the assets of the Spresso business in a private sale.

## II.    THE DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE.

29.     The common shares of Boxed are traded on the New York Stock Exchange under the symbol "BOXD."  Boxed is the sole member of Boxed, LLC, while Boxed, LLC is the sole member of Ashbrook, Jubilant, and Boxed Max.  A chart depicting the Debtors' corporate structure is shown below:

*[The remainder of this page is intentionally left blank]*



30.     As of the Petition Date, the Debtors have approximately $147 million of funded debt obligations, consisting of obligations under the First Lien Term Loan, Second Lien Term Loan, and the Convertible Notes (each as defined below).

**A.      THE FIRST LIEN TERM LOAN**

31.     On August 4, 2021, Boxed and Boxed, LLC entered into a certain first lien term loan facility (the "First Lien Term Loan") pursuant to a credit agreement (as amended, restated, or otherwise modified from time to time, the "First Lien Credit Agreement"), and other related loan and security documents (collectively with the First Lien Credit Agreement, the "First Lien Loan Documents").  Under the First Lien Credit Agreement with Alter Domus as administrative agent

(the "Prepetition First Lien Agent"), and the lenders party thereto (collectively, the "Prepetition First Lien Secured Lenders") Boxed, LLC borrowed a principal amount of $45 million (the "First Lien Term Loan"), with interest payable at a floating per annum rate of SOFR plus 8.5%, and a maturity date of August 4, 2025.

32.     The First Lien Term Loan is guaranteed by Boxed, Jubilant, Ashbrook, and Boxed Max.  Pursuant to the First Lien Loan Documents, the Prepetition First Lien Agent, for the benefit of the Prepetition First Lien Secured Lenders, was granted first priority liens and security interests in substantially all of the Debtors' assets, including, without limitation, all of the Debtors' cash, which cash is maintained in accounts subject to control agreements in favor of the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Secured Lenders.

33.     The First Lien Credit Agreement also contains certain financial covenants which require the Debtors to maintain (i) a minimum unrestricted cash balance of $15.0 million, (ii) minimum net retail revenue based upon agreed upon quarterly targets, and (iii) a retail gross margin percentage of at least 8%.  These net retail revenue and retail gross margin targets are tested quarterly on a trailing twelve-month basis.

### 1.     Amendment to First Lien Credit Agreement

34.     On January 20, 2023, concurrently with the Debtors obtaining financing by entering into the Second Lien Term Loan facility, described below, the First Lien Credit Agreement was amended to provide, among other things, (i) a reduction of the minimum unrestricted cash covenants from $15.0 million to $10.0 million and (ii) a waiver of the quarterly minimum retail revenue covenant for the quarter ended December 31, 2022.  The Debtors are not in compliance with the minimum unrestricted cash balance covenant as of the Petition Date.

35.     The First Lien Credit Agreement was also amended to permit the transactions contemplated by the Second Lien Credit Agreement (defined below) and to establish certain

milestones (each a "Sale Milestone" and collectively the "Sale Milestones") for a potential sale of all or a portion of the Debtors' businesses in the first half of fiscal year 2023. In particular, the First Lien Credit Agreement, as amended, requires a sale process (the "Sale Process") to proceed along the following Sale Milestones:

    i. no later than February 15, 2023, delivery to the Prepetition First Lien Secured Lenders of an indication of interest from a third party (a "Sale Indication of Interest"),

    ii. no later than March 1, 2023, delivery to the Prepetition First Lien Secured Lenders of an effective letter of intent a ("Sale LOI") or signed term sheet, executed by a *bona fide* third party pursuant to which such third party agrees to purchase more than 50% of the aggregate equity interests or assets of the Debtors for cash consideration (a "Sale Agreement"),

    iii. no later than March 15, 2023, delivery of an executed Sale Agreement to the Prepetition First Lien Secured Lenders, and

    iv. no later than April 14, 2023, consummation of the transactions contemplated by the Sale Agreement. Failure to achieve any Sale Milestone by the applicable date would constitute an event of default under the First Lien Credit Agreement.

As of the Petition Date, the Debtors were not in compliance with the foregoing Sale Milestones.

36. Shortly prior to the Petition Date, to support a continued forbearance by the Prepetition First Lien Secured Lenders under the First Lien Credit Agreement, the Debtors paid down $4 million on the First Lien Term Loan and, as of the Petition Date, approximately $41.5 million in principal amount of the First Lien Term Loan remains outstanding.

**B.    SECOND LIEN TERM LOAN**

37. On January 20, 2023, Boxed and Boxed, LLC entered into a second lien term loan facility pursuant to a credit agreement (as amended, amended and restated or otherwise modified from time to time, the "Second Lien Credit Agreement") and other related loan and security documents (collectively with the Second Lien Credit Agreement, the "Second Lien Loan Documents") dated January 20, 2023, by and among Boxed, Boxed, LLC, the lenders party thereto (the "Second Lien Term Lenders"), and Wilmington Savings Fund, FSB, as administrative agent

(the "Prepetition Second Lien Agent").  Pursuant to the Second Lien Credit Agreement, Boxed, LLC borrowed $10 million (the "New Money Second Lien Term Loan") and agreed to exchange $32.4 million of Convertible Notes (as defined and described below) held by the Second Lien Term Lenders on a dollar-for-dollar basis (the "Convertible Note Second Lien Loans," and, together with the New Money Second Lien Term Loan, the "Second Lien Term Loans").

38.     The Second Lien Term Loans are guaranteed by Boxed, Jubilant, Ashbrook and Boxed Max LLC, each of which is a Debtor in these Chapter 11 Cases.  Pursuant to the Second Lien Loan Documents, the Prepetition Second Lien Agent, for the benefit of the Second Lien Term Loans, was granted a second priority lien and security interest on substantially all of the Debtors' assets. The Second Lien Term Loans bear interest, payable in the form of paid-in-kind interest on the Interest Payment Dates (as defined in the Second Lien Credit Agreement), at a rate per annum equal to 11.00%, or 13.00% while any event of default has occurred and is continuing.  The Second Lien Credit Agreement also features a guaranteed contractual minimum return on investment of 1.5x for the Second Lien Term Lenders in connection with certain trigger events such as the pre-payment or re-payment of the principal term loan balance, or an acceleration of the Second Lien Term Loans.  The Second Lien Term Loans mature on December 14, 2026.  As of the Petition Date, approximately $43 million in principal and accrued interest remains outstanding on the Second Lien Term Loans.

39.     The Second Lien Credit Agreement also requires sale milestones—nearly identical to those in the First Lien Credit Agreement—relating to the Sale Process and the timeframe for achieving such milestones.  In particular, the Second Lien Credit Agreement requires the Debtors to comply with the same sale milestones as described with respect to the First Lien Credit Agreement above, but the deadline for each such milestone is seven days later than in the First

Lien Credit Agreement, thereby requiring the Debtors to consummate the transactions contemplated in a sale agreement by April 21, 2023. Failure to achieve the sale milestones within such timeframes would constitute an event of default under the Second Lien Credit Agreement.

40. The rights and relative priorities in the collateral securing the obligations arising under the First Lien Loan Documents and the Second Lien Documents are governed by an Intercreditor Agreement dated as of January 20, 2023 (the "Intercreditor Agreement"), among the Prepetition First Lien Agent and the Prepetition Second Lien Agent, which Intercreditor Agreement was acknowledged and agreed to by Boxed and Boxed, LLC.

### C. THE CONVERTIBLE NOTES

41. Upon consummation of the SPAC Transaction, and in connection with the issuance of an aggregate of $87.5 million principal amount of 7.00% Convertible Senior Notes due 2026 (the "Convertible Notes"), Boxed and U.S. Bank National Association, as trustee, entered into an indenture dated December 8, 2021 governing the Convertible Notes (the "Indenture"). The Convertible Notes were offered in a private placement under the Securities Act of 1933, as amended, pursuant to the convertible note subscription agreements entered into in connection with the SPAC Transaction (the "Convertible Note Subscription Agreements"). The Convertible Notes have a maturity date of December 15, 2026, unless earlier repurchased, redeemed, or converted.

42. The Convertible Notes accrue interest at a rate of 7.00% per annum, payable semi-annually in arrears on June 15 and December 15 of each year, beginning on June 15, 2022, subject to Boxed's ability to elect, instead of the payment of interest in cash, to increase the principal amount of the outstanding Convertible Notes (PIK interest). As of December 31, 2022, the PIK interest payments on June 14, 2022 and December 15, 2022 were added to the outstanding principal. $0.3 million of the Convertible Notes principal balance was converted in exchange for shares of Boxed, with an additional $32.4 million of principal balance exchanged for Convertible

Note Second Lien Loans, as described above. As of the Petition Date and following exchange of the Second Lien Lenders Convertible Notes, as described above, approximately $62.6 million in principal (and accrued interest up until the Petition Date) of the Convertible Notes remains outstanding.

43. The Convertible Notes are guaranteed by Boxed, LLC. The Convertible Notes constitute senior, unsecured obligations of Boxed and Boxed, LLC.

## III. CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES.

### A. THE DEBTORS' BUSINESS CHALLENGES AND PRESERVING THE BUSINESS IN THE FACE OF POTENTIAL DEFAULT REMEDIES.

44. As an emerging growth company, the Debtors' business model prioritized growth over short-term profits. As a result, the Debtors have incurred net cash outflows from operating activities since their inception and have been dependent on outside capital. Consistent with this growth strategy, for the year ended December 31, 2022, the Debtors' net loss was $118.8 million and net cash used in operating activities amounted to $94.4 million. As of year-end 2022, the Debtors had a cash balance plus marketable securities of only $21.3 million, as well as restricted cash of $2.5 million.

45. The Debtors initially attempted to address their operational cash flow requirements by meaningfully reducing operational cash burn, and by seeking outside capital. In August 2022, the Debtors communicated to their shareholders ongoing updates to their strategic vision, with the key operational initiative being to reprioritize resource investment and accelerate the Debtors' path to profitability, simultaneously while reducing ongoing cash burn. In order to accomplish this vision, the Debtors discussed refocusing investments and deploying resources towards delivering growth of their more profitable customer channels and business segments, which included their B2B and Boxed Market Channels within the retail business, as well as Spresso. In the first quarter

following the announcement of its strategic vision update (third quarter of 2022 earnings release and 10-Q filing), the Debtors announced that Retail Segment gross profit and gross margin had improved 88.8% and 503 basis points, respectively, compared to the prior year period. Further, the Debtors drove a quarter-over-quarter sequential improvement in adjusted EBITDA of $6.1 million compared to the second quarter of 2022. However, the combination of profitability improvements and cost savings initiatives were not enough to support meaningfully additional investor interest at the time, and the Debtors could not fully eliminate ongoing cash burn from operations and working capital requirements.

46.    Consistent with their strategic update, in the fall of 2022, the Debtors began negotiations with the Prepetition First Lien Secured Lenders concerning an amendment to the First Lien Credit Agreement. They also explored opportunities to raise incremental capital from other potential lenders to help fund ongoing operating costs and working capital obligations. As a consequence of these negotiations, on January 20, 2023, the Debtors amended the First Lien Credit Agreement and entered into the Second Lien Credit Agreement, raising the additional $10 million of New Money Second Lien Term Loan, which included an opportunity raise a further $10 million in incremental capital, for a total potential capital inflow of $20 million, if the Debtors achieved certain milestones pursuant to the Second Lien Credit Agreement.

47.    Throughout the fall of 2022, the Debtors explored a variety of additional capital markets solutions to support their cash needs, including equity, structured equity, specialty asset finance, and structured debt alternatives (collectively, the "Capital Markets Alternatives"). The Debtors' management team and board of directors determined that the terms and conditions of the Capital Markets Alternatives were unfavorable and that the ability to execute on any of the Capital Markets Alternatives was uncertain. Therefore, the Debtors proceeded with the execution of the

Amended First Lien Credit Agreement and the Second Lien Credit Agreement because they believed this avenue provided the best opportunity to maximize value for their stakeholders.

48.     On March 1, 2023, the Debtors and the Prepetition First Lien Secured Lenders entered into a forbearance agreement (the "Forbearance Agreement"), pursuant to which the Prepetition First Lien Secured Lenders agreed to forbear from exercising any rights and remedies as a result of the Debtors' alleged failure to timely deliver a letter of interest, so long as the Debtors complied with certain incremental milestones (the "Forbearance Milestones").  The Prepetition First Lien Secured Lenders have agreed to extend or waive these Forbearance Milestones from time to time to allow the Debtors to continue with the liquidation and the Sale Process.

### B.     THE DEBTORS' EFFORTS TO ADDRESS BUSINESS CHALLENGES AND THE PREPETITION MARKETING PROCESS.

49.     In the fall of 2022, faced with significant liquidity pressures and unanticipated pressures on the Debtors' business, the Debtors and their management team began evaluating potential strategic alternatives.  As a result, the Debtors' management team determined that a sale of some or all of the Debtors' business was the best available path to maximize value for the benefit of all of the Debtors' stakeholders.

50.     On November 9, 2022, the Debtors retained Solomon Partners ("Solomon") to help run the Sale Process, including to help identify potential third-party purchasers for some or all of the Debtors' business segments, including Spresso, the Retail Segment, or both.[3]  Solomon, along with the Debtors' management team, began its prepetition marketing process by identifying a substantial number of potential third-party purchasers that could have interest and the resources to purchase some or all of the Debtors' assets.

---

[3]     To aid in the Debtors' review of potential strategic alternatives and the Sale Process, the Debtors also subsequently retained Freshfields Bruckhaus Deringer US LLP as legal counsel, and FTI Consulting, Inc. as financial advisor.

51.     The Debtors and Solomon left no stone unturned in identifying potential third-party purchasers to engage in a transaction.  Solomon began outreach to potential purchasers on or about December 16, 2022, and since that time has contacted at least 142 potential purchasers.  The Debtors provided potential purchasers with confidential information memoranda regarding Spresso, the Retail Segment, or both, and provided potential purchasers with letters describing potential bidding processes and procedures.   This resulted in the Debtors executing 26 confidentiality agreements and engaging in management presentations and fireside chats with 14 different counterparties, including with major international and U.S. retailers, a sub-set of which had multiple follow-up meetings with management.  The Debtors and Solomon also opened a virtual data room for counterparties who continued to engage, which contained diligence materials to help support the ongoing marketing of the assets, including those associated with both the Spresso business and the Retail Segment, or both.  On February 15, 2023, the Debtors received an indication of interest (an "IOI") from one potential purchaser (the "Potential Purchaser,") and, on March 1, 2023, the Debtors received a letter from the Potential Purchaser expressing its intent to acquire substantially all the assets of the Spresso business, subject to financing, closing conditions and customary due diligence.   However, the Potential Purchaser was unable to proceed to consummate a transaction.

52.     In the weeks leading up to the commencement of these Chapter 11 Cases, Solomon continued to facilitate outreach and diligence between the Debtors and other potential third-party purchasers.  In addition, Solomon re-initiated contact with potential third-party purchasers that it had previously contacted, both those counterparties who had shown prior engagement in the process and otherwise, to inform them of the Debtors' potential chapter 11 filing, which would likely include a sale of some or all of the Debtors' business or business segments pursuant to

Section 363 of the Bankruptcy Code. Further, the Debtors, with the assistance of their advisors, provided counterparties with drafts of an asset purchase agreement which reflected provisions that would be customary in the context of a sale under Section 363 of the Bankruptcy Code. Interested parties were offered the opportunity to become a stalking horse bidder, including potential bidding protections such as a break-up fee. Despite this, the Debtors were unable to obtain a stalking horse proposal.

53. Despite the Debtors' tenacious efforts to market the assets of the Debtors, such efforts have not yielded any additional indications of interest or actionable offers. Furthermore, the Debtors' liquidity position has deteriorated to the point that the Debtors have been forced to pursue additional strategic alternatives, including commencing these Chapter 11 Cases. The Debtors have been unable to obtain incremental financing, including DIP financing.

54. Ultimately, and in furtherance of the forbearance, on March 24, 2023, the Debtors prepaid the First Lien Term Loan in the amount of $4,052,888.00, inclusive of $52,888.00 of Administrative Agent professional fees. The Debtors and the Prepetition First Lien Secured Lenders also agreed on a budget for the Debtors' consensual use of the Prepetition First Lien Secured Lenders' cash collateral, with no attendant DIP financing arrangements, which will enable the Debtors to complete these Chapter 11 Cases expeditiously.

### C.      PROPOSED PRIVATE SALE PROCESS.

55. As described above, the Debtors believe that a prompt sale of the Spresso business through a private sale to an entity owned and designated by the Prepetition First Lien Secured Lenders is the best and only available way to maximize the value of the Debtors' estates. In light of the challenges the Debtors face, the Debtors are critically focused on maintaining the stability of the Spresso business to facilitate a value-maximizing sale and the swift and orderly transition of the Spresso business as a going concern to the Prepetition First Lien Secured Lenders.

56.     More specifically, following substantial, arms'-length negotiations, the Debtors and the Prepetition First Lien Secured Lenders have agreed in principle to terms for the purchase of substantially all of the Debtor's Spresso business by an entity owned and designated by the Prepetition First Lien Secured Lenders for a credit bid of $26.25 million.   The terms of this agreement are set forth in the asset purchase agreement (the "Spresso APA") attached as **Exhibit B** to the *Motion of the Debtors for Entry of an Order (i) Authorizing the Private Sale of Certain Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (ii) Approving Credit Bid Under Section 363(K) of the Bankruptcy Code, (iii) Authorizing the Assumption and Assignment of Certain Executory Contracts, and (iv) Granting Other Related Relief* (the "Spresso Sale Motion"), filed contemporaneously herewith.[4]   The Spresso APA contemplates the preservation of approximately 25 full time employment positions with the post-sale Spresso business.

57.     The Prepetition First Lien Secured Lenders also premised their willingness to allow consensual use of their cash collateral to fund these Chapter 11 Cases on the sale of the Spresso business being a private sale.  In light of the Debtors' significant cash burn, which led to a reduction in the Debtors' available cash from $21.3 million as of December 31, 2022 to $4.4 million today[5], and the fact that the substantial prepetition marketing process undertaken by the Debtors and their advisors, has not yielded an actionable offer to date, the Prepetition First Lien Secured Lenders were unwilling to allow the further use of their collateral to fund operational losses for the length of time it would take to run an additional marketing process involving post-petition marketing,

---

[4]     The final terms of the Spresso APA remain subject to ongoing discussion between the parties and the parties expect that the final version will be substantially similar to the version attached to the Spresso Sale Motion.

[5]     The reduction includes a $4 million paydown of the First Lien Term Loan and approximately $1.8 million in transaction fees, prepayment of interest, and advisor fees related to the amendment to the First Lien Credit Agreement and Second Lien Credit Agreement.

approval of bid procedures, bidding deadlines and an auction, as delay of the sale for four or five additional weeks would mean funding losses that would exceed the cash available to the Debtors today.

58.     To ensure that the Debtors received the highest or otherwise best value reasonably and practically available, the Debtors have continued to contact and re-contact all potential purchasers to market the Debtors' assets, and to explore whether they would provide any higher or better value for the Acquired Assets (as defined in the Spresso APA) than the offer embodied in the Spresso APA. These efforts have not yielded any new offers or even expressions of interest.

59.     Indeed, the Debtors have presided over an extensive Sale Process that has, to date, failed to yield any actionable offers for the Debtors' businesses, including the Retail Segment, other than the offer for the Spresso business reflected in the Spresso APA. Given that Solomon and the Debtors have contacted more than 170 potential purchasers, and that many potential purchasers were contacted multiple times, I believe the Sale Process is unlikely to result in a higher or better offer for the Acquired Assets than the terms embodied in the Spresso APA, and I cannot identify any potential purchaser that has not already been contacted that may have an interest in the Spresso business, and would be able to close on the required timeframe.

60.     As a result, I believe that the Debtors' estates will derive a material benefit from the speed and certainty from closing the private sale transaction and that the Debtors' estates would suffer material economic damage if a post-petition sales process was pursued.

**D.     THE DEBTORS' GOVERNANCE PROTOCOLS.**

61.     The Debtors' board of directors is comprised of eight members, all of whom are independent directors, with the exception of Chieh Huang, the Debtors' Chief Executive Officer. During the course of the Debtors' prepetition restructuring efforts, in March 2023, the Debtors

added Pamela Corrie to the board of directors as the eighth director.  Ms. Corrie has substantial restructuring experience.

62.     In addition, the board of directors also formed a three-person restructuring committee (the "Restructuring Committee"), comprised of Ms. Corrie, as chair, as well as Emerson Moore II and David Liu.  All of the members of the Restructuring Committee are independent directors with no roles in management or relationships to management.

63.     The Restructuring Committee has been informed of the terms of the Spresso Sale and discussed the Spresso Sale with the Debtors' advisors, determined that the Spresso Sale is in the best interests of all of the Debtors' stakeholders, and supports the Debtors proceeding with the Spresso Sale.  In light of this, the Restructuring Committee has recommended to the board of directors that it approve the terms of the Spresso Sale, which the board did subsequently approve.

64.     I understand that discussions have commenced between and among the Prepetition First Lien Secured Lenders and Spresso management concerning the terms of a management incentive plan to be implemented in connection with the closing of the Spresso APA.  I further understand that once the terms of the management incentive plan are more fully developed, they will be shared with and reviewed by the Restructuring Committee and ultimately disclosed to the Court well in advance of the hearing with respect to the Sale Motion.

## IV.    FIRST DAY PLEADINGS

65.     The Debtors filed the First Day Pleadings[6] concurrently with the commencement of these Chapter 11 Cases.  I have reviewed each of the First Day Pleadings (including the exhibits and schedules attached thereto) and, to the best of my knowledge, information and belief, the facts set forth therein are true and correct.  Based on my personal knowledge, information supplied to

---

[6]     Unless otherwise defined herein, capitalized terms used herein shall have the meaning ascribed to them in the relevant First Day Pleadings filed contemporaneously herewith.

me by and discussions with other members of the Debtors' management, Debtors' counsel and professionals and representatives, my review of relevant documents, my opinion based upon my experience and the aforementioned review and discussions, and as set forth in more detail below, I believe the relief sought in the First Day Pleadings is: (a) vitally necessary for the Debtors to (i) effectuate a smooth transition into, and operate within, these Chapter 11 Cases, (ii) avoid immediate and irreparable harm, and (iii) avoid interruption or disruption to its business and estate to the greatest extent practicable; (b) in the best interests of the Debtors' creditors, estates, and other stakeholders; and (c) constitutes a critical element in maximizing value during the Chapter 11 Cases.

66.     Several of these pleadings request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors' estates. Other relief will be deferred for consideration at a later hearing.

A.     **THE DEBTORS' NEED FOR ACCESS TO CASH COLLATERAL**

67.     On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral and (B) Grant Adequate Protection to the Prepetition Secured Parties, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "Cash Collateral Motion"), seeking authority to use cash collateral, and obtain related relief. The Debtors' use of cash collateral, if

approved, would provide the Debtors with access to liquidity immediately upon entry of an order (the "Cash Collateral Order").

68.     As of the petition date, I understand that the Debtors will have approximately $4.4 million of unrestricted cash on hand and believe that the Debtors will require immediate use of cash collateral to ensure they have sufficient liquidity during the interim period to fund essential costs and expenses, including the costs of the Debtors' post-petition sale, and to avoid irreparable harm to the Debtors' operations. In addition, the Debtors will require full access to the cash collateral to continue operations and fund the working capital needs of Spresso until such time as a final sale can be effectuated, to consummate the sale of the Acquired Assets and to wind down the Debtors' estates thereafter, including the Retail Segment. There will be no debtor in possession financing, as the Debtors, with the assistance of their advisors, have concluded that the use of cash collateral will be sufficient to support operations and maintain necessary liquidity on the currently contemplated schedule for these Chapter 11 Cases, so long as the sale is approved quickly on a final basis. The Prepetition First Lien Secured Lenders have consented to the use of their cash collateral subject to the conditions set forth in the Cash Collateral Order.

69.     I believe that the Debtors need the liquidity being provided by the use of cash collateral to ensure sufficient working capital to operate their Spresso business, continue winding down their Retail Segment, administer their estates, and effectuate the sales contemplated. Specifically, the Debtors have an immediate need to obtain the use of cash collateral to, among other things, in addition to consummate a sale of Spresso, (i) permit the orderly continuation of Spresso until the sale is effectuated, (ii) maintain business relationships with their Spresso customers, vendors and other parties, (iii) make payroll for Spresso, (iv) pay the costs of winding down the Debtors' affairs, including but not limited to the Retail segment, and administering these

Chapter 11 Cases, and (v) satisfy other working capital and general corporate purposes of the Debtors.

70. The Debtors, in consultation with their advisors, have also determined that absent the use of cash collateral, the Debtors will be unable to continue operating Spresso at the levels that are necessary to preserve that business' goodwill, customer loyalty, and reputation in the marketplace. Thus, immediate access to cash collateral is crucial to the Debtors' efforts to preserve value for their stakeholders during these Chapter 11 Cases.

71. Based upon my conversations with the Debtors' management team and advisors, I believe that, without access to cash collateral, the Debtors will not have sufficient sources of working capital to operate their business to the extent necessary to maximize value for the benefit of their estates, creditors and other parties in interest.

**B.      OTHER FIRST DAY PLEADINGS**

72. The Debtors filed, or will soon file, certain other First Day Pleadings seeking relief related to the administration of the Chapter 11 Cases and the Debtors' operations to ensure a smooth entry into chapter 11.

73. A list of the other First Day Pleadings is set forth below:

a.  *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief*

b.  *Application of the Debtors for Entry of an Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of the Petition Date*

c.  *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms; and (II) Granting Related Relief*

d.  *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief*

e. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder and (B) Renew, Supplement, Modify, or Purchase Insurance Coverage; (II) Authorizing Continuation of Insurance Premium Financing Agreements; and (III) Granting Related Relief*

f. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Critical Vendor Claims, Foreign Claims, Lienholder Claims, 503(b)(9) Claims, and PACA/PASA Claims; and (II) Granting Related Relief*

g. *Debtors' Motion for Entry of Interim and Final Orders (I)(A) Approving Debtors' Proposed Form of Adequate Assurance of Payment for Future Utility Services, (B) Approving Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (C) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services; and (II) Granting Related Relief*

h. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Reimbursable Expenses, Employee Benefits Obligations, and other Compensation, and (B) Continue Compensation and Employee Benefits Program, and Pay Related Administrative Obligations; and (II) Granting Related Relief*

i. *Debtors' Motion for Entry of an Order (I) Authorizing Redaction of Certain Personal Identifying Information Within the Consolidated List of Creditors, (II) Authorizing Service to Customers Via Email, and (III) Granting Related Relief*

j. *Debtors' First Omnibus Motion for Entry of an Order (I) Authorizing the Debtors to Reject Certain Executory Contracts and Unexpired Leases Effective as of the Rejection Date and (II) Granting Related Relief*

74. The above referenced First Day Pleadings seek authority to, among other things, honor work-force related compensation and benefit obligations, pay certain prepetition claims, and continue using the Debtors' bank accounts, and continue other operations in the ordinary course of business. The Debtors have narrowly tailored these First Day Pleadings to meet the goals of: (i) continuing their operations in chapter 11 to preserve and maximize value for the Debtors' estates and their creditors; (ii) provide an adequate runway for the Debtors to effectuate a sale of

their assets during the Chapter 11 Cases; and (iii) establishing procedures for the efficient administration of the Chapter 11 Cases.

75.     I have reviewed each of the above First Day Pleadings (including the exhibits thereto), and I believe the facts stated therein to be true and correct to the best of my knowledge, with appropriate reliance on corporate officers, business records and advisors. I incorporate by reference the factual statements set forth in each of the First Day Pleadings as though set forth herein

## **CONCLUSION**

76.     The Debtors' ultimate goal in these Chapter 11 Cases is to achieve an orderly and efficient sale of the Spresso business to maximize the value of the Debtors' estates for their stakeholders, and to wind down the remainder of the Debtor's business thereafter.  To minimize any loss of value, the Debtors' immediate objective is to obtain first day relief to continue operating their Spresso business in the ordinary course, with as little interruption or disruption to Spresso operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and completing a successful Sale Process will be substantially enhanced.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.


Dated: April 2, 2023                                    */s/ Mark Zimowski*
                                                        Name:  Mark Zimowski
                                                        Title:   Chief Financial Officer
                                                                    Boxed, Inc.